FILED by **ICY** D.C.

ELECTRONIC

**September 2, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. **09-CV-22609-Lenard/Garber**

IRV ZELDMAN, On Behalf of Himself and
All Others Similarly Situated,

     Plaintiff,

  vs.

PERSHING LLC and THE BANK OF NEW
YORK MELLON CORPORATION,

     Defendants.

—————————————————— /

**COMPLAINT – CLASS ACTION**

**<u>JURY TRIAL DEMANDED</u>**

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff Irv Zeldman ("Zeldman" or "Plaintiff"), by his undersigned attorneys, Coughlin Stoia Geller Rudman & Robbins LLP and the Law Offices of Calvacca Moran, on behalf of himself and the Class (defined below, ¶89), brings this action against defendants Pershing LLC and The Bank of New York Mellon Corporation (collectively, "Defendants") and alleges the following upon information and belief, formed after an inquiry reasonable under the circumstances, except as to those allegations which pertain to the named Plaintiff (which are alleged on personal knowledge), as follows:

## NATURE OF THE ACTION

1.      This class action is brought against Defendants for equitable (injunctive and/or declaratory) relief, breach of express warranty, negligence, gross negligence, breach of contract, breach of implied contract, negligence *per se*, unjust enrichment and violation of Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.*, as well as similar deceptive trade practices statutes and consumer protection statutes in effect in other states nationwide (collectively, the "Unfair Trade Practices Statutes").

2.      This is a class action complaint arising from Defendants' improper, reckless, and negligent failure to protect or safeguard the personal, financial and confidential information of Plaintiff and the Class members he seeks to represent.  Consumers have an interest in maintaining the privacy of their personal, financial and confidential information and have a reasonable expectation that Defendants would not place at risk or fail to safeguard their confidential information.

3.      Plaintiff and the Class entered into, or were the intended beneficiaries of, a contract with Defendants.  Defendants, as a clearinghouse and service provider for financial institutions or firms, maintain millions of individual private and corporate brokerage accounts.

1

4.      In connection with Defendants' function as a clearinghouse or service provider for the accounts of Plaintiff and the Class, Defendants were entrusted with their confidential information, including personal and inherently private facts.

5.      As the current or previous data-holder for Plaintiff's and the Class' financial accounts, Defendants had and continue to have a duty to safeguard and protect the privacy of their clients or accountholders and not to disclose, or allow to be disclosed, any confidential information of Plaintiff and the Class.

6.      Defendants assured their business customers – *e.g.*, the financial institutions, firms, independent broker-dealers ("IBD") and registered investment advisors ("RIA") that entrusted Defendants with their respective clients' private information – that the sensitive or private information of the accountholders would remain confidential and that Defendants would safeguard that information.  Defendants also assured their own retail customers – *e.g.*, accountholders of brokerage accounts held by The Bank of New York Mellon Corporation and/or its subsidiaries – or retail customers of IBDs and RIAs, such as The GMS Group ("GMS") that the sensitive or private information of the accountholders would remain confidential and that Defendants would safeguard that information.

7.      However, Defendants improperly, negligently or recklessly failed to protect private information belonging to Plaintiff and the Class.  Specifically, Defendants failed, and continue to fail, to adequately safeguard accountholder information and data on the NetExchange Pro (explained below) system or application.

8.      This suit seeks equitable relief and damages on behalf of Plaintiff and the Class.

## PARTIES

9.      Plaintiff Zeldman is a resident of Dade County, State of Florida.  Plaintiff's account information, through his account with GMS, is maintained and serviced by Defendants.

2

10.     Defendant Pershing LLC, a single member Delaware limited liability company and wholly-owned subsidiary of Pershing Group LLC (collectively, "Pershing"), is one of the world's leading providers of securities services and has approximately $718.5 billion in assets held in custody.  Pershing is the industry's largest global outsourcing provider, serving more than 200 international financial organizations and doing business in more than 60 markets.  Pershing currently administers, either directly or through its IBDs and RIAs, including GMS, approximately five million private and corporate accounts.  Pershing is incorporated in Delaware and headquartered in Jersey City, New Jersey.  Pershing is a subsidiary of defendant The Bank of New York Mellon Corporation.  Pershing is licensed to conduct business, and does conduct business, in the State of Florida.

11.     Defendant The Bank of New York Mellon Corporation ("Mellon") is an asset management and securities services company.  Mellon is incorporated in Delaware and headquartered in New York City.  Mellon has $19.5 trillion in assets under custody or administration and $881 billion under management.  Mellon is licensed to conduct business, and does conduct business, in the State of Florida.

## JURISDICTION AND VENUE

12.     The Court has original jurisdiction over this matter, pursuant to 28 U.S.C. §1332(d), in that the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action of more than 100 potential Class members in which the citizenship of at least one proposed Class member is different from that of at least one defendant.

13.     Venue properly lies in this District pursuant to 28 U.S.C. §1391(a), because Plaintiff and Defendants reside, are found, have an agent, or have transacted substantial business within the Southern District of Florida within the meaning of 28 U.S.C. §1391(a) as defined in 28 U.S.C.

3

§1391(c), and because a substantial part of the events giving rise to the claims alleged herein occurred in the Southern District of Florida.

## SUBSTANTIVE ALLEGATIONS

14.     Pershing is self-described as the leading provider of global financial business solutions, with more customers who clear with it than any other firm.  Pershing services more than 1,150 IBDs and RIAs (including, for example GMS) who, in turn, have approximately five million retail accountholders in the aggregate.  Pershing also services all of the accountholders who invest directly with Mellon.

15.     Pershing operates as a division or agent of Mellon, providing various services, including clearing services, to its IBDs and RIAs, as well as accountholders with brokerage accounts held by Mellon or its subsidiaries.

16.     Upon information and belief, in addition to its ownership over Pershing, Mellon exercises wide-ranging control over the management and operations of Pershing.  Indeed, the Chief Executive Officer of Pershing, Richard F. Brueckner, is an Executive Committee member of Mellon.  Further, Mellon commonly manages Mellon and Pershing through uniform policies and procedures, including, for example, Mellon's employee code of conduct and privacy policy.  Thus, the acts of Pershing described in this Complaint are attributable to Mellon under the doctrine of actual agency.

17.     Additionally, Mellon holds out Pershing to the general public to be a division of Mellon and as having overall control of Pershing.  Pershing specifically describes Mellon as its "parent company" and Mellon describes Pershing as a "business unit" of Mellon.  Thus, the acts of Pershing described in this Complaint are attributable to Mellon under the doctrine of apparent agency.

4

**Defendants' NetExchange Pro Application**

18.     In connection with the clearing or financial services they provide, Defendants utilize a proprietary management system called NetExchange Pro.

19.     NetExchange Pro is an internet-based information management system created and owned by Defendants.

20.     NetExchange Pro is utilized to provide Pershing employees and investment professionals with access to accountholder information, quotes, and research tools. NetExchange Pro also allows an End User (defined below, ¶35) to view and manage individual client records. In doing so, NetExchange Pro permits access to non-public, private information ("NPPI") data, including social security numbers, taxpayer identification numbers, bank account numbers, account balances, documents with digitized signatures and net worth of the millions of end/retail customers of Defendants' broker-dealer and financial advisor clients.

21.     NetExchange Pro is the primary platform for Defendants' business model and is an important source of revenue for Defendants.

22.     Employees of Defendants, as well as employees of IBDs and RIAs, can use NetExchange Pro while off-site from their personal home computers – meaning, away from their work terminals or computers. Through the off-site access, employees have access to the firm's mainframe hosted records, including scanned or digitized document repository. In essence, Defendants' employees and the employees of IBDs and RIAs can access unencrypted NPPI from their home or off-site computers. Defendants advertise this feature as providing "access anytime anywhere." The off-site access, markedly, does not have the requisite information technology security provisions mandated for Defendants' office-based machines and company-owned laptop devices.

5

23.     NetExchange Pro simply does not provide a reasonable level of security to protect against the compromise of customers' personal and proprietary information.

24.     Plaintiff and members of the Class entrusted their confidential information to Defendants – directly or indirectly through their financial broker or advisor – with the knowledge and understanding that Defendants would not allow their private information to be compromised or unsecure.

25.     Defendants have both an inherent and express obligation or duty to Plaintiff and the Class members to safeguard account information maintained on NetExchange Pro.

**Defendants' Representations Concerning**
**the Security of Pershing's Website and**
**NetExchange Pro Application**

26.     In the age of identity theft, the privacy of confidential information is an issue of extreme importance to consumers and the public at large.  Defendants are cognizant of that fact, particularly where they seek to be entrusted by their customers with an accumulation of confidential information, ranging from financial statements, account records, asset information, social security numbers, etc.  With the public's concern of privacy in mind, Defendants represent and warrant the focus on protecting confidential information and maintaining the privacy of accountholder data.

27.     The "Privacy Policy" posted on Pershing's website underscores the following:

Protecting the confidentiality of your nonpublic personal information is of paramount importance to Pershing. As such, Pershing maintains high industry standards in protecting and safeguarding such nonpublic personal information.

*        *        *

How does Pershing protect your personal information?

- Internal data security policies restrict access to nonpublic personal information to authorized associates. Pershing maintains physical, electronic, and procedural safeguards that are designed to comply with federal standards to guard nonpublic personal information. Associates who violate these polices are subject to disciplinary action, up to and including termination.

6

- • Pershing trains and educates our employees in the handling and safeguarding of personal information in accordance with applicable laws, rules, and regulations.

*See* http://www.pershing.com/privacy_policy.html.

28.     The Privacy Policy linked to the log-on screen for NetExchange Pro contains identical language (as quoted in ¶26).   *See*  https://www2.netxpro.com/privacypolicy.htm; https://www2.netxpro.com/.

29.     Further, Pershing highlights the security of NetExchange Pro through a bulletin linked to the log-on screen for NetExchange Pro, which reads:

**Latest in Account Security!**

NetExchange® provides investment professionals with private, secure communications. Our clients' confidential account information and transactions are secured (encrypted) with the latest Netscape Secure Commerce Server technology, the best in the industry. Additionally, professionals are required to access their accounts using one of the latest secure browsers such as Netscape Navigator (version 6.1 or higher) or Microsoft's Internet Explorer (version 4.0 or higher).

*See* https://www2.netxpro.com/homeaboutsit.htm.

30.     Separately, and throughout Pershing's website, Defendants stress the strength of the technology they offered and emphasize security and protection measures implemented to protect the information maintained on the NetExchange Pro system or application as a motivation for customers to use Defendants' service. For example:

Security—for You and Your Clients

Pershing has been a leading global provider of financial business solutions for 70 years and serves many of the world's most respected financial organizations, remaining focused on the safekeeping, servicing, segregation, and reporting of assets held in our custody. Pershing is well capitalized and our capital ratios exceed those required by regulators.

\*        \*        \*

In addition, Pershing ensures all data through comprehensive security methods, extensive back-up systems, and well-developed contingency plans safeguard your personal data and account information. Since privacy, confidentiality, and identity

7

protection are of such critical importance, we maintain stringent physical, electronic, and procedural safeguards.

*See* http://www.pershing.com/events/insite/articles/consolidation-change-for-better.html.

Pershing Prime Services offers a robust technology infrastructure with more than 2,000 professionals throughout Pershing's worldwide organization dedicated to providing you with the speed, security, and reliability you demand.

*See* http://www.pershing.com/prime/flexible_technology/index.html.

We offer state-of-the-art technology, a highly reliable and scalable infrastructure, and a host of innovative products and services to help you expand your offering.

*See* http://www.pershing.com/about_us/index.html.

31. Additionally, Mellon, on its own website, makes similar claims as to the stringency of safeguards designed to protect customer NPPI. *See* http://www.bnymellon.com/privacy/index.html.

32. Protection of accountholder privacy is fundamental to the NetExchange Pro system and Defendants' clearing or service provider roles. Accountholders expected, and Defendants represented, that the necessary measures would be implemented to safeguard confidential information or data.

33. Indeed, in connection with the services it provides to accountholders, Pershing issues a disclosure statement containing the information accountholders should consider with respect to Pershing's role or responsibility to them (the "Disclosure Statement").

Pershing recognizes, in its Disclosure Statement, that the firm with which accountholders opened their security accounts retained Pershing to provide record keeping or operational services (the "Clearing Agreements"). The Disclosure Statement provides that the services provided to accountholders are performed or provided per the Clearing Agreements between Pershing and the accountholders' firm.

34. The accountholders are, plainly, third-party beneficiaries to the Clearing Agreements between Pershing and various financial organizations.

8

35.    Indeed, the Disclosure Statement explicitly states that "Pershing is only responsible for the services within the scope of the Clearing Agreement that is provided at the request of your firm."

36.    The Disclosure Statement lists or identifies several responsibilities that Pershing has to accountholders.

37.    Among the responsibilities that Pershing owes to accountholders under its Disclosure Statement is that it will create computer-based account records, prepare and transmit confirmation of trades to shareholders, provide firms or financial institutions with written reports of all transactions processed for accounts.

38.    The Disclosure Statement further adopts a privacy policy.   Pershing readily acknowledges that the privacy policy delineated in the Disclosure Statement applies for the benefit of accountholders.

39.    The privacy policy in Pershing's Disclosure Statement reads, in pertinent part, as follows:

> Working on behalf of your firm, Pershing recognizes the importance of protecting the confidentiality of nonpublic personal information (NPPI) that it collects about its customers.  The information is used to ensure accuracy in reporting and record keeping, maintain its customers' accounts, and effect requested transactions.  A top priority for Pershing is to keep this information secure.
>
> 1.    Pershing collects nonpublic personal information from the following sources:
>
> ■    Applications or other forms (obtaining name, address, Social Security number, assets, and income);
> ■    Customers' transactions with Pershing, their firms, or others; and
> ■    Consumer reporting agencies (obtaining credit worthiness and credit history).

40.    With respect to the manner in which that information is secured or protected by Pershing, the Disclosure Statement adds the following:

9

Internal data security policies restrict access to nonpublic personal information to authorized employees. Pershing maintains physical, electronic, and procedural safeguards that are designed to comply with federal standards to guard NPPI.

\* \* \*

Pershing does not disclose NPPI about former customers, except as permitted or required by law.

41.     While privacy and protection should have been, and should continue to be, provided by the NetExchange Pro system, it was not and is not.

**Defendants' Inadequate Protection or Security**
**of Personal and Private Information**
**Belonging to Plaintiff and the Class**

42.     Defendants obtained a broad range of confidential information of Plaintiff and members of the Class through their capacity as a clearinghouse for brokers and financial advisors, as well as through their ownership and operation of the NetExchange Pro system.

43.     Defendants charged Plaintiff and Class members or, alternatively, their IBDs, RIAs, and brokerage account managers, various fees for services rendered by Defendants.  Upon information and belief, these fees included charges for maintaining safeguards on accountholder information.  In turn, these fees have been charged back to Plaintiff and Class members.

44.     Despite Defendants' obligations and duties to maintain the privacy of Plaintiff's and Class members' confidential information, Defendants did not and do not have satisfactory safety and security measures in place to protect accountholder information.

45.     As such, Plaintiff and Class members did not receive the full value of Defendants' safeguarding services and the fees associated with those service, therefore, have not been fully or adequately earned by Defendants.

46.     Upon information and belief, at least as early as March 2008, Defendants were aware of inadequacies to the security measures intended to protect and safeguard accountholder

10

information maintained on the NetExchange Pro application. Specifically, the NetExchange Pro system did not (and does not) maintain effective encryption or security protocols when accessed from a remote computer or any other internet-enabled devices, including Blackberries, Smart Phones, iPhones, Netbooks, personal laptops or public domain accessible devices in hotels, internet cafes and public libraries (collectively, "Unsecured Devices").

47.     Defendants' employees, as well as the employees of their business customers – *e.g.*, IBDs and RIAs ("End Users") – can remotely access the NetExchange Pro system from Unsecured Devices.

48.     Upon information and belief, there are as many as 100,000 End Users that have the capability of accessing NetExchange Pro remotely.

49.     Indeed, Defendants encourage their business customers to input their clients' personal information into the NetExchange Pro system. In doing so, Defendants promote the portability of this information to Unsecured Devices without affording adequate encryption or security protocols.

50.     Without adequate encryption or security protocols in place for access to NetExchange Pro by End Users, accountholder information is unprotected.

51.     In effect, accountholder information that can be accessed by an End User is protected by nothing more than the protection available on the End User's computer or device.

52.     Further, the accountholder information accessed by an End User is housed locally on the End User's computer and becomes readily available to anyone with access to that computer. This is significant should, for example, an End User's laptop get sold or stolen, as accountholder information would be accessible to the purchaser or thief. Also, by way of example, if an End User accesses the NetExchange Pro system through a public computer or terminal (*e.g.*, library computer), accountholder information will be readily accessible to any subsequent user of that computer.

11

53.     Upon information and belief, Defendants were (and are) well aware of the improper disclosure of accountholder information through these means.

54.     Upon information and belief, Defendants have made recent efforts to mitigate the privacy security breach through limitations on access to NPPI data for certain of Defendants' employees.  Irrespective of the limited solution Defendants' recent efforts may have on furthering the protection of customers' proprietary information, it is not an exhaustive remedy.  By way of example, upon information and belief, Defendants have made no effort whatsoever to secure the wide-ranging access afforded to the approximately 100,000 employees of their broker-dealer and financial advisor clients.

55.     Moreover, simply downloading information while utilizing the internet-based application of NetExchange Pro will create a permanent memory of personal and proprietary customer information on the housed computer or terminal.  The permanent imprint or record of that information, in turn, becomes as vulnerable as any basic information maintained on an unsecure or unencrypted computer.

56.     Once the customers' proprietary information is saved to an off-site computer or terminal, there is no easy or straightforward method for either reversing the unsecure transmission or causing the information to be irretrievable from outside sources (*e.g.*, hackers).  Permanent deletion of information from a computer or terminal can only be effectuated through costly technical processes or the physical destruction of the hard-drives.

57.     Information purposefully or inadvertently saved on Unsecured Devices though the use of NetExchange Pro, therefore, becomes readily accessible to outside sources, subsequent users of the terminal, or the like.  In effect, NetExchange Pro regularly facilitates the compromise of customer information and the ease with which customers can fall victim to identity theft.

12

**Defendants' Utilize a Greater Level of Security to
Protect Their *Own* Proprietary Information Than is
Utilized to Protect Information on the NetExchange Pro System**

58.    Defendants maintain their own proprietary information, including, for example, internal corporate documents and other valuable corporate information, with greater care than they maintain accountholder information.  Defendants have the knowledge and technology to provide the equivalent level of safeguarding to accountholder information as they do their own internal information.

59.    Defendants utilize a variety of heightened or sophisticated security solutions and measures for their own proprietary confidential information systems.  The implemented security measures are employed in connection with Defendants' End-User authentication, network access and controls, as well as End-User device management and controls.

60.    Specifically, Defendants utilize a multi-tier authentication protocol in-house or in connection with their own proprietary information.   The first tier is password protection.  The second tier is a physical secure ID device ("ID Device").  The ID Device presents the remote access End-User with a computer-generated random numeric sequence every minute.  This time-sensitive numeric sequence must be used by End-Users along with a current password when logging in for systems access.

61.    To the contrary, Defendants' utilize only a single tier password application authentication in connection with the NetExchange Pro system.

62.    Further, access to Defendants' own proprietary information requires the use of a virtual private network tunnel ("VPN").  A VPN allows information to be shared through a computer

13

network in which some of the links are carried by virtual circuits in larger networks, as opposed to running across a single private network.

63.     To the contrary, the NetExchange Pro system uses only simple internet-based HTTPS – Hypertext Transfer Protocol Secure – security protocol.

64.     What is more, access to Defendants' in-house or proprietary information requires End-Users to use either: (1) a bank-owned device, which includes local device encryption, enhanced and regularly updated security features and protocols; or (2) remote access or virtualization software (*e.g.,* Citrix Systems), which enables an end-user to access information through a "virtual desktop image" on a personal or public device.

65.     To the contrary, these protocols do not apply to information maintained on the NetExchange Pro system.

66.     Clearly, Defendants possess the knowledge and technology to adequately safeguard accountholder information.  At a minimum, Defendants can adopt the security measures they use to protect their in-house data or own proprietary information for use in the NetExchange Pro system. Instead, Defendants implemented and continue to utilize inadequate security measures in connection with the information maintained on, and accessible through, the NetExchange Pro system.

**Defendants' Failure to Provide
Notice to Plaintiff or Members of the Class**

67.     Notwithstanding the foregoing, upon information and belief, Defendants have not notified their broker-dealer and financial advisor customers of the security deficiencies associated with the use of NetExchange Pro.

68.     Further, Defendants have not provided notice to Plaintiff or the Class members about their improper, reckless or negligent exposure of their private information.

14

69.     Had Plaintiff and members of the Class known about the inadequacies of Defendants' systems, they would not have entrusted their personal and proprietary information with Defendants.

**Significance of Protecting the Private**
**Information of Plaintiff and Members of the Class**

70.     Consumers have a vested interest in protecting all of their confidential or private information, ranging from bank account information, credit card information, debit card information, social security numbers, asset information and the like.

71.     The compromise of one or more of these items, however, will have divergent impacts on consumers. For example, the compromise of credit or debit card information, while wearisome on consumers, can generally be remedied without difficulty (*e.g.*, through cancellation of the account number or reissuance of the card) and often without financial harm to the consumer. The compromise of bank account or asset information can cause immediate financial harm to an impacted consumer and cannot easily be reversed. Even worse, the compromise of a social security number can place the impacted consumer at risk for identity theft for an infinite period of time.

72.     In June 2007, the United States Government Accountability Office ("GAO") issued a report entitled "Personal Information – Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown" (the "2007 Report"). The 2007 Report addresses different types of identity theft and, specifically, highlights the gravity of compromised social security numbers in the following manner:

> There are two primary forms of identity theft. First, identity thieves can use financial account identifiers, such as credit card or bank account numbers, to take over an individual's existing accounts to make unauthorized charges or withdraw money. Second, thieves can use identifying data, which can include such things as SSNs and driver's license numbers, to open new financial accounts and incur charges and credit in an individual's name, without that person's knowledge. ***This second form of identity theft is potentially the most damaging because, among other things, it can take some time before a victim becomes aware of the problem, and it can cause substantial harm to the victim's credit rating.***

15

(Emphasis added.)

73.     The 2007 Report further acknowledged that a compromised or stolen social security number can harm the impacted consumer for several years. Specifically, the 2007 Report noted:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

74.     The GAO's June 17, 2009 report entitled "Identity Theft – Governments Have Acted to Protect Personally Identifiable Information, but Vulnerabilities Remain" (the "2009 Report") added that "[p]rotecting personally identifiable information … such as names, date of birth and SSNs, is critical because its loss or unauthorized disclosure can lead to serious consequences for individuals."

75.     The significant impact identity theft can have on consumers and the extreme financial ramification the failure to secure personal information can cause has led to the enactment of numerous privacy-related laws aimed toward protecting consumer information and disclosure requirements, including, for example: (1) Gramm-Leach-Bliley Act; (2) Fair Credit Reporting Act; (3) Fair and Accurate Credit Transactions Act; (4) Federal Trade Commission Act, 15 U.S.C. §§41-58; (5) Driver's Privacy Protection Act; (6) Health Insurance Portability and Accountability Act; (7) The Privacy Act of 1974; (8) Social Security Act Amendments of 1990; (9) E-Government Act of 2002; and (10) Federal Information Security Management Act of 2002.

76.     Protection of consumers' private information is obviously critical. Consumers are at the mercy of the security measures or controls utilized by those entities that use or maintain their confidential or private information. Consumers, likewise, have no ability to ascertain whether their private information is being adequately protected or, worse, if their private information has been compromised in any way. *See, generally*, the 2009 Report. Where, as here, consumer information is and has been inadequately protected and the entity maintaining that information conceals the

16

inadequate safety measures and possibility that a breach occurred or is occurring, consumers become highly vulnerable to identity theft.

**The Conception and Impression of
Synthetic Identity Theft**

77. The inadequate security measures undertaken by Defendants can further damage Plaintiff and members of the Class through exposure to synthetic identity theft. Synthetic identity theft is a variation of identity theft which has become more prevalent in recent years.

78. Through synthetic identity theft, identities are completely or partially fabricated. The most common method is by utilizing a technique or scheme in which a real social security number is combined with a name and birthdate other than the ones associated with the number.

79. The harm that synthetic identity theft can cause stems from the fact that it is more difficult to track than ordinary identity theft. In many cases, it does not appear on an individual's credit report directly. Rather, it will appear as an entirely new file with the credit bureaus or as a sub-file to the victim's credit reports.

80. Consumers can also be impacted if their names become confused with a synthetically-created identity.

81. Synthetic identity theft is difficult to trace because the blend of information creates an entirely new identity. As a result, synthetic identity theft can go unnoticed for several years.

82. Indeed, a person's identity could have been compromised and been used to create a synthetic identity, without the victim knowing that the breach of his identity took place and that the damage of the identity took place and/or is ongoing.

83. Credit monitoring, or even a thorough review of one's credit report, is not likely to uncover synthetic identity theft. Synthetic identity theft activity is less likely to appear on a consumer's credit report than ordinary – or "true name" – identity theft because the identifying

17

information used to open new credit accounts does not precisely match one particular consumer. As alleged, if the identifying information does appear, the information is often only linked to the credit file as a sub-file, rather than appearing in (or being linked to) the main report.

84. Based upon the manner in which credit reporting systems operate, credit monitoring services will generally overlook instances in which a thief uses a different name, date of birth and/or address in conjunction with the consumer's real social security number.

85. Victimized consumers are left with the difficulty of resolving and sorting out the fictitious information from their own. What is worse, in some instances, victimized consumers can be forced to absolve themselves of any fraudulent debts.

86. Moreover, the victim of synthetic identity theft who does not learn that his private information – *e.g.* social security number – was compromised until years after the breach took place cannot then identify the source or origin of the compromise.

## CLASS ACTION ALLEGATIONS

87. This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff brings this action both in his individual capacity, and as a class action against Defendants, on behalf of himself and all persons in the United States whose private and confidential information is or was maintained on an account with a broker, investment advisor, or directly with Mellon, its affiliates or subsidiaries that utilizes or utilized Defendants' clearing or financial services and/or subscribes or subscribed to the use of the NetExchange Pro system, directly or indirectly, since it was introduced in or about 2001, and whose private and confidential information is or has thereby been inadequately protected and subjected to risk of public exposure as a result (the "Class").

88. In the alternative, pursuant to Rule 23(c)(5) of the Federal Rules of Civil Procedure, Plaintiff seeks to represent a subclass of persons currently residing or have resided in Florida whose

18

private and confidential information is or was maintained on an account with a broker, investment advisor, or directly with Mellon, its affiliates or subsidiaries that utilizes or utilized Defendants' clearing or financial services and/or subscribes or subscribed to the use of the NetExchange Pro system, directly or indirectly, since it was introduced in or about 2001, and whose private and confidential information is or has thereby been inadequately protected and subjected to risk of public exposure as a result (the "Sub-Class").

89.    Excluded from the Class or the alternative Sub-Class are Defendants, including any entity in which Defendants have a controlling interest, or which is a parent or subsidiary of, or which is controlled by, Defendants, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, or assigns of Defendants.

90.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery. Plaintiff believes, however, that there are in excess of five million members of the proposed Class, including both current and past accountholders and members of their families who may have been named as beneficiaries or joint accountholders and whose NPPI was entrusted, either directly or indirectly, to Defendants.

91.    Common questions of law and fact exist as to all Class members and predominate over any questions which affect only individual Class members. These common questions of law and fact include:

(a)    whether Defendants improperly, recklessly, or negligently subjected the private or confidential information of Plaintiff and members of the Class to be inadequately protected;

19

(b)      whether Defendants failed to exercise the requisite standard of care to protect the confidential information of Plaintiff and members of the Class;

(c)      whether Defendants took reasonable measures to safeguard the confidential information of Plaintiff and members of the Class;

(d)      whether Defendants owed a duty to Plaintiff and members of the Class to protect their confidential information;

(e)      whether Defendants breached their duties or obligations to Plaintiff and the Class;

(f)      whether Defendants were grossly negligent in the manner in which they breached their duties or obligations to Plaintiff and the Class;

(g)      whether Defendants acted in reckless disregard of the duties or obligations owed to Plaintiff and the Class;

(h)      whether Plaintiff and the Class have been charged fees by Defendants for privacy safeguarding services which were not provided;

(i)      whether Defendants have been unjustly enriched through their conduct toward Plaintiff and members of the Class;

(j)      whether the laws of the State of Florida, and to the extent applicable, substantially similar laws of other states, were violated by Defendants, by engaging in the acts alleged and described herein; and

(k)      whether Plaintiff and the Class have sustained damages, and, if so, what is the proper measure of damages.

92.      Plaintiff's claims are typical of the claims of the Class he seeks to represent in that Plaintiff and each Class member sustained, and continue to sustain, damages arising from

Defendants' wrongdoing. Plaintiff's damages, as well as the damages of each Class member, were caused by Defendants' wrongful conduct as alleged herein.

93.     Plaintiff will fairly and adequately protect the interests of those Class members he seeks to represent and has no interests that are antagonistic to the interests of any other Class member. Plaintiff has retained counsel who have substantial experience and success in complex litigation, including the litigation of class actions and consumer protection claims, including privacy protection claims in the class action context.

94.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable. Furthermore, because the damages suffered, and continued to be suffered, by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

95.     In addition, the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

COUNT I

**Breach of Express Warranty**

96.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 above as if fully set forth herein.

97.     Defendants expressly represented and warranted to Plaintiff and the members of the Class that their personal and confidential information would be protected.

21

98.     The protection and security of accountholder information was and is confirmed and promised, for example, through Defendants' Privacy Policy and/or the Disclosure Statement.

99.     Nevertheless, absent the knowledge or consent of Plaintiff and the members of the Class, Defendants allowed the personal and private information of accountholders to be exposed and unsecured. The disclosure of customers' confidential information is in direct breach of Defendants' express warranty.

100.    As a direct and proximate result of Defendants' improper, reckless or negligent course of conduct, Plaintiff and the Class members suffered harm. In turn, Plaintiff and the Class members are entitled to damages in an amount to be proven at trial (or Plaintiff and the Class members were irreparably harmed by Defendants' conduct).

## COUNT II

### Breach of Contract

101.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 above as if fully set forth herein.

102.    Plaintiff and the Class members are intended third-party beneficiaries of contracts entered into between Defendants and third parties, including, for example, independent brokers or financial advisors that utilize Defendants' clearing or financial services or employ the use of the NetExchange Pro application.

103.    The Clearing Agreements form a contractual relationship between Plaintiff and members of the Class with Pershing and/or Defendants.

104.    Defendants are contractually obligated to take the necessary steps to safeguard the private and confidential information of Plaintiff and the Class.

105.    The Clearing Agreements require that Defendants take the necessary steps to safeguard the private and confidential information of Plaintiff and the Class.

106. Defendants charge fees to their independent dealers, financial advisors and in-house account managers for Pershing services for safeguarding accountholder information which fees, in turn, are charged back to Plaintiff and the Class. However, such safeguarding services were not provided by Defendants.

107. Upon information and belief, the Clearing Agreements require that Defendants promptly provide notice and disclose when a breach occurs and/or when an accountholders' information was rendered unsecure.

108. Defendants breached the Clearing Agreements, thereby causing injury to Plaintiff and the Class.

## COUNT III

### Negligence

109. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 above as if fully set forth herein.

110. At all material times, Defendants owed a duty to Plaintiff and the Class to act with the ordinary care of reasonableness with respect to all aspects of the services promised, including, but not limited to, the protection and privacy of confidential information, including the social security numbers of Plaintiff and the Class members.

111. The standard of care owed to Plaintiff and the Class arises from common law, as well as from secondary sources, including, for example, representations made by Defendants, industry standards, as well as related laws and regulation.

112. Defendants failed to adequately protect or safeguard the confidential information of Plaintiff and the Class, failed to establish procedures to prevent and detect the improper dissemination of that confidential information, and failed to alert or disclose that accountholders' private information was at risk for exposure through the NetExchange Pro application.

23

113.    Defendants' mishandling of accountholder confidential information constitutes a deviation from the standard of care owed to Plaintiff and the Class.

114.    As a proximate cause of Defendants' negligence, Plaintiff and the Class have been damaged and injured as described herein.

**COUNT IV**

**Gross Negligence/Reckless Disregard**

115.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 and ¶¶110-114 above as if fully set forth herein.

116.    At all times, Defendants knew that the NetExchange Pro system did not and does not contain adequate security measures and that, as a result, the personal and private information of Plaintiff and the Class have been and are vulnerable to compromise.

117.    Defendants knowingly failed to adequately protect or safeguard the confidential information of Plaintiff and the Class, knowingly failed to establish procedures to prevent and detect the improper dissemination of that confidential information, and knowingly failed to alert or disclose that accountholders' private information was at risk for exposure through the NetExchange Pro application.

118.    Defendants, therefore, have grossly deviated from the standard of care owed Plaintiff and the Class in their knowing mishandling of customer confidential information.

119.    Alternatively, Defendants' deviation from the standard of care owed to Plaintiff and the Class was reckless and willful and was undertaken to enhance the profitability of NetExchange Pro and Pershing's market preeminence.

120.    As a proximate cause of Defendants' gross negligence and/or reckless conduct, Plaintiff and the Class have been damaged and injured as described herein.

24

## COUNT V

### Negligence *Per Se*

121.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 above as if fully set forth herein.

122.     Statutes and regulations require corporations, such as Defendants, that experience a data breach or compromise of customers' private and confidential information to promptly notify affected consumers.   Fla. Stat. § 817.5681, for example, requires business persons maintaining computerized data that includes personal information (*e.g.*, social security number, credit or debit card numbers, or financial account numbers) to provide notice of breaches of system security.

123.     Defendants failed to notify Plaintiff or the Class that their confidential information had been compromised (and remains at risk to be compromised) through inadequate security or protection measures in the NetExchange Pro application.

124.     As a proximate cause of Defendants' negligence, Plaintiff and the Class have been damaged and injured as described herein.

## COUNT VI

### Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.*, and the Unfair Trade Practices Statutes

125.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 above as if fully set forth herein.

126.     At all relevant times, Defendants provided goods and/or services and thereby were engaged in trade or commerce, as defined by Fla. Stat. §501.203.

127.     At all relevant times, Plaintiff and the Class were consumers, as defined by Fla. Stat. §501.203.

25

128.    Defendants were aware that their customers provided private information and personally identifiable material in connection with Defendants' clearing and financial servicing roles.

129.    Accountholders expected, and Defendants assured, that confidential information maintained on the NetExchange Pro system would be protected and that it would not be disclosed to third parties.

130.    Defendants engaged in unfair or deceptive acts and practices by knowingly permitting the confidential information to be exposed through the system they was unsecure or had inadequate safeguards, resulting in the dissemination of personal and private information of customers in direct violation of the Unfair Trade Practices Statutes.

131.    Defendants' practice and course of conduct, as alleged herein, is likely to mislead – and has misled – the consumer acting reasonably in the circumstances, to the consumer's detriment.

132.    Further, Defendants have engaged in an unfair practice that offends established public policy, and is one that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to customers.

133.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class members suffered actual damages and request a corresponding award of damages against Defendants, as authorized by such statutes.

134.    In the alternative, Plaintiff and the Class members have suffered irreparable harm for which there is no adequate remedy at law as a result of Defendants' conduct and Plaintiff and the Class members are entitled to appropriate temporary and permanent injunctive relief, as authorized and provided by such statutes.  Plaintiff and the Class members are further entitled to preliminary or

26

other relief as provided by such statutes, including statutory damages, punitive damages, costs and reasonable attorneys' fees.

**COUNT VII**

**Breach of Implied Contract**

135.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 above as if fully set forth herein.

136.    The private and confidential information of Plaintiff and the Class members was provided to Defendants in order for Defendants to provide their clearing or financial services on behalf of Plaintiff and the Class.  Implicit in this transaction was a covenant for Defendants to undertake reasonable efforts to safeguard, protect and secure this information.  Also implicit in this transaction was a covenant for Defendants to promptly notify their clients and accountholders in the event that this information was compromised or at risk.

137.    Defendants' recognition of these covenants and obligations is implicit in their representations to Plaintiff and the Class regarding the importance of maintaining strong security measures to protect confidential information.

138.    This implied contract required Defendants to safeguard the private and confidential information of Plaintiff and the Class and prevent that information from being compromised and/or stolen.

139.    Defendants did not safeguard and protect the private and confidential information of Plaintiff and the Class and failed to adequately prevent that information from being compromised or available for unauthorized dissemination.  To the contrary, Defendants allowed (and continue to allow) this information to be disclosed to unauthorized parties.

140.    As a result, Defendants breached their implied contract with Plaintiff and the Class, thereby causing injury to Plaintiff and the Class.

27

## COUNT VIII

### Unjust Enrichment

141.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 above as if fully set forth herein.

142.     Defendants charge fees to their independent dealers, financial advisors and fund managers for Pershing services for safeguarding accountholder information which fees, in turn, are charged back to Plaintiff and the Class. However, such safeguarding services were not provided by Defendants.

143.     As a result of receiving fees for services not rendered, Defendants have received a benefit at the expense of Plaintiff and the Class under circumstances that, pursuant to equity and good conscience, require restitution.

144.     By virtue of the foregoing, Defendants have been unjustly enriched in an amount yet to be determined with respect to Plaintiff and the Class.

## COUNT IX

### Equitable (Injunctive and/or Declaratory) Relief

145.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-95 above as if fully set forth herein.

146.     Account information of Plaintiff and the Class members was and is being maintained by Defendants.

147.     Through the relationship between Plaintiff and Defendants, and Class members and Defendants, Defendants were obligated to maintain the privacy of their clients' accountholders and not to disclose any confidential information belonging to Plaintiff and the Class members.

148.     During the Class Period, Defendants breached these obligations by failing to protect the account information and other private information of Plaintiff and the Class members.

28

149.     Instead, Defendants allowed the account information of Plaintiff and the Class members to be at risk for public dissemination through a known deficiency in the security protocol of the NetExchange Pro application.

150.     No adequate remedy at law exists to address the exposure of the confidential information of Plaintiff and the Class members due to Defendants' actions or inactions.

151.     Accordingly, Plaintiff, on behalf of himself and the Class, requests the following equitable relief:

(a)     A judicial determination and declaration of the rights of Plaintiff and the Class and the responsibilities of Defendants with respect to the remains that are the subject of this action;

(b)     That Defendants be enjoined to remedy the known deficiency in the security protocol of the NetExchange Pro application;

(c)     That Defendants notify their clients and clients' accountholders of the security breach and the risk that accountholder information may have been stolen or compromised;

(d)     That Defendants undertake the necessary steps to remedy the exposure of personal and private information of Plaintiff and the Class on off-site computers that were left vulnerable to compromise due to the insecure NetExchange Pro system by, for example, overriding or "scrubbing" the hard drives of those computers (*e.g.*, Unsecured Devices used by End Users in the employ of IBDs and RIAs);

(e)     That Defendants disclose to Plaintiff and the Class, insofar as is possible, the full list of accountholders whose information was at risk for public dissemination as a result so that the individuals may be contacted and informed of the susceptibility of their personal information and the possibility that the secrecy of their confidential information has been compromised; and

(f)     That Defendants be determined and declared to be financially responsible for the costs and expenses of remedying the exposure of the social security numbers of Plaintiff and the Class members, including, for example, the cost of monitoring and protection against identify theft, credit card fraud and the like.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests the following relief, on behalf of himself and the Class:

A.      Certification of this action as a class action, appointment of Plaintiff as a Class representative and undersigned counsel as Class counsel;

B.      An award of equitable, injunctive and declaratory relief described herein, including judicial supervision of Defendants and a judicial determination of the rights and responsibilities of the parties regarding the remains that are the subject to this action;

C.      Declaring the actions complained of herein to be in violation of the statutory and common laws set forth above;

D.      Enjoining and restraining Defendants from any further acts in violation of the statutory and common laws set forth above;

E.      Requiring Defendants to take the necessary measures to adequately secure the NetExchange Pro system and protect the confidential information of their clients' accountholders;

F.      An award of compensatory damages in an amount deemed appropriate by the trier of fact, jointly and severally against Defendants, including, but not limited to, the cost of identity theft protection for Plaintiff and Class members;

G.      An award of compensatory damages in an amount deemed appropriate by the trier of fact, jointly and severally against Defendants, including, but not limited to, the amount of fees ultimately charged back to Plaintiff and the Class for privacy safeguarding services which were owed to Plaintiff and the Class but were never provided;

30

H.     Disgorgement and restitution;

I.     An award of punitive damages, jointly and severally, against Defendants;

J.     An award of prejudgment and post-judgment interest;

K.     An award of costs, including, but not limited to, discretionary costs, attorneys' fees and expenses incurred in pursuing this case;

L.     Any other and further equitable relief this Court deems just and proper; and

M.     Any other and further relief to which Plaintiff and the Class may be entitled at law or in equity.

DATED:  September 1, 2009                COUGHLIN STOIA GELLER RUDMAN
                                           & ROBBINS LLP
                                         PAUL J. GELLER
                                         Florida Bar No. 984795
                                         STUART A. DAVIDSON
                                         Florida Bar No. 084824
                                         CULLIN A. O'BRIEN
                                         Florida Bar No. 597341


                                         _____
                                               CULLIN A. O'BRIEN

                                         120 E. Palmetto Park Road, Suite 500
                                         Boca Raton, FL  33433
                                         Telephone:  561/750-3000
                                         561/750-3364 (fax)
                                         pgeller@csgrr.com
                                         sdavidson@csgrr.com
                                         cobrien@csgrr.com

31

COUGHLIN STOIA GELLER RUDMAN &
  ROBBINS LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
MARK S. REICH
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LAW OFFICES OF CALVACCA MORAN
STEPHEN J. CALVACCA
P. O. Box 1334
66 Frazar Road
West Falmouth, MA  02574-1334
Telephone:  508/540-9911

*Attorneys for Plaintiff and the Class*

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**ELECTRONIC**

**September 2, 2009**

**STEVEN M. LARIMORE**
**CLERK U.S. DIST. CT.**
**S.D. OF FLA. - MIAMI**

## I. (a) PLAINTIFFS

IRV ZELDMAN, On Behalf of Himself and All Others Similarly Situated,

**(b)** County of Residence of First Listed Plaintiff   Miami-Dade County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
120 E. Palmetto Park Road, Suite 500, Boca Raton, FL 33432
(561) 750-3000

## DEFENDANTS

PERSHING LLC and THE BANK OF NEW YORK MELLON
CORPORATION,

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose: ✓ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

09-22609- LENARD /GARBER

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☑ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | |
| | Employment | ☐ 550 Civil Rights | Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | Statutes |
| | Other | | Detainee | | |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO      b) Related Cases ☐ YES ☑ NO

JUDGE                DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. §1332(d) – Causes of action include: equitable relief, breach of express warranty, negligence, gross negligence, breach of contract, breach of implied contract, negligence per se, unjust enrichment and violation of Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, et seq.

LENGTH OF TRIAL via   15   days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
>$5,000,000

CHECK YES only if demanded in complaint:

JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD        DATE

Cullin A. O'Brien        *Cullin O'Brien*        September 1, 2009

FOR OFFICE USE ONLY

AMOUNT 350.00   RECEIPT # 547326   IFP

34 of 34